UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X
ANTONIOS MANALIS,

                Plaintiff,

        -against-

PRIMIS BANK,

                Defendant.
------------------------------------------------------------X

**MEMORANDUM
AND ORDER**
25-CV-3066 (OEM) (TAM)

**TARYN A. MERKL**, United States Magistrate Judge:

On June 2, 2025, Plaintiff Antonios Manalis ("Plaintiff" or "Mr. Manalis")

initiated this action against TransUnion LLC a/k/a TransUnion[1] and Defendant Primis

Bank ("Primis" or "Defendant"). *See generally* Compl., ECF 1. Plaintiff alleges claims for

violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*, and the

Fair Credit Billing Act ("FCBA"), 15 U.S.C. § 1666, *et seq. Id.* On July 31, 2025, Defendant

filed a motion for a pre-motion conference regarding an anticipated motion to compel

arbitration. Pre-Mot. Conference Letter, ECF 16. On August 1, 2025, the Honorable

Orelia E. Merchant referred Defendant's pre-motion conference request, as well as any

resulting motion, to the undersigned Magistrate Judge.[2] Aug. 1, 2025 ECF Referral

---

[1] On September 2, 2025, Plaintiff filed a stipulation of dismissal as to TransUnion. Stipulation of Dismissal, ECF 21. On September 4, 2025, the Honorable Orelia E. Merchant issued an order dismissing TransUnion from the case. Sept. 4, 2025 Order Dismissing Party.

[2] "'District courts in this Circuit regularly have concluded that a motion to compel arbitration and stay litigation pending arbitration is non-dispositive and therefore within a

Order. On September 19, 2025, Defendant filed a motion to compel arbitration, and on April 22, 2026, the Court held a hearing on the pending motion. Mot. to Compel Arbitration ("Mot."), ECF 25; Apr. 22, 2026 ECF Min. Entry & Order. Based on the findings of fact and conclusions of law set forth below, Defendant's motion to compel arbitration is granted.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

## I. Factual Background

According to the complaint, "[i]n or around June or July 2022, Plaintiff visited a medical facility" for a "free check-up and to inquire about potential medical services." Compl., ECF 1, ¶ 11. Plaintiff asserts that at no time during this medical appointment "did Plaintiff apply for any form of credit, consent to any financial arrangement, authorize the release or use of his personal information for the purpose of obtaining a loan, or undergo any medical procedure for which a loan would be necessary." *Id.* ¶ 12. Plaintiff avers that he "never filled out a credit application, was never presented with, nor did he ever view or sign, any loan agreement or related financial disclosures." *Id.* Rather, Plaintiff asserts that he left the clinic after simply obtaining general information during the free consultation. *Id.* ¶ 13.

Over a year after the visit to the medical facility, around September 2023, Plaintiff discovered "a previously unknown loan account on his credit report with a

_____

Magistrate Judge's purview to decide without issuing a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b).'" *Kurmangaliyev v. Verizon Wireless Servs., LLC*, No. 25-CV-3749 (LDH) (JAM), 2026 WL 1266383, at *1 n.1 (E.D.N.Y. May 8, 2026) (quoting *Puig v. City of New York*, 733 F. Supp. 3d 218, 219 n.1 (S.D.N.Y. 2024)) (collecting cases); *see, e.g., McCants v. Team Elec., Inc.*, No. 19-CV-9565 (AJN) (RWL), 2021 WL 653122, at *1 n.1 (S.D.N.Y. Feb. 19, 2021) (citing *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 227 n.1 (S.D.N.Y. 2020) (collecting cases)). Accordingly, the Court issues its decision as a Memorandum and Order.

2

balance of approximately $6,000." *Id.* ¶ 14. Plaintiff learned that this allegedly fraudulent account "was reported as originated by Primis and opened on or about June 21, 2022." *Id.* Upon discovering the account, Plaintiff contacted Primis (and/or its agent Momnt Technologies, Inc. ("Momnt")[3]) multiple times by phone. *Id.* ¶ 15. During these calls, Plaintiff states that he disputed the account, asserting that it was illegitimate and that he never applied for or authorized the loan. *Id.* Plaintiff also requested documentation related to the loan, and "demanded its immediate investigation and removal from his credit report." *Id.*

Despite Plaintiff's requests, Plaintiff asserts that "Primis failed to provide any documentation to substantiate the alleged debt or to verify that Plaintiff had knowingly or voluntarily entered into any credit relationship." *Id.* ¶ 16. Rather, Plaintiff goes on to claim that Primis "vaguely indicated the loan was related to a medical procedure" at the clinic Plaintiff had visited. *Id.* Plaintiff even returned to the clinic in an attempt to locate additional information, but the clinic "was unable to locate any medical bills or records under his name corresponding to such a loan." *Id.*

On February 20, 2025, Plaintiff filed a formal Identity Theft Report with the Federal Trade Commission ("FTC") regarding the Primis loan. *Id.* ¶ 17. Additionally, on February 27, 2025, Plaintiff sent a dispute package to TransUnion, notifying TransUnion of, *inter alia*, the identity theft and the fraudulent Primis account. *Id.* ¶ 18. Plaintiff asserts that Primis "failed to conduct . . . an investigation" or "review all relevant information, including Plaintiff's direct attestations and the FTC Identity Theft Report," in violation of its statutory duties. *Id.* ¶¶ 22–23. Rather, after receiving notice of the

---

[3] The Court notes that Momnt is misidentified in the complaint as "Moment." Compl., ECF 1, ¶ 15 (quotation marks omitted).

dispute, "Primis continued to furnish inaccurate information regarding the Fraudulent Account to TransUnion and other [credit reporting agencies]." *Id.* ¶ 24. Moreover, Plaintiff claims that "Primis also failed to provide Plaintiff with any billing statements, loan agreements, default notices, or other communications typically associated with a legitimate debt obligation, further evidencing the fraudulent nature of the account and Primis' own deficient record-keeping or investigation." *Id.* ¶ 26.

## II.  Procedural History

As noted above, Plaintiff initiated this action on June 2, 2025. *See generally id.* On July 31, 2025, Defendant filed a letter requesting a pre-motion conference for leave to file a motion to compel arbitration. Pre-Mot. Conference Letter, ECF 16. On August 1, 2025, Judge Merchant referred Defendant's pre-motion conference request, as well as any forthcoming motion to compel arbitration, to the undersigned Magistrate Judge. Aug. 1, 2025 ECF Referral Order. On August 11, 2025, Plaintiff filed a response in opposition to Defendant's pre-motion conference letter. Pl.'s Resp. Letter, ECF 17.

On August 21, 2025, the Court held a telephonic pre-motion conference to discuss Defendant's request for leave to file a motion to compel arbitration. Aug. 21, 2025 ECF Min. Entry & Order. The Court granted Defendant's request and set a briefing schedule for the motion. *Id.* On September 19, 2025, the fully briefed motion to compel arbitration was filed. Mot., ECF 25; Mem. in Supp. of Mot. to Compel Arbitration ("Mem."), ECF 25-1; Mem. in Opp'n ("Opp'n"), ECF 27; Reply, ECF 28.

On November 7, 2025, the Court held a status conference and set a date for an evidentiary hearing on the motion. Nov. 7, 2025 ECF Min. Entry & Order; *see also* Nov. 3, 2025 ECF Scheduling Order. Additionally, in light of the parties' representation that they were open to settlement, the Court directed the parties to file a joint letter by November 10, 2025, proposing mutually available dates for a settlement conference

before the Court. *Id.* Following receipt of the joint letter on November 10, 2025, the Court scheduled an initial settlement conference for December 10, 2025. Joint Letter, ECF 32; Nov. 12, 2025 ECF Scheduling Order.

While the parties were unable to reach a settlement at the December 10, 2025 settlement conference, they continued to engage in settlement discussions. Dec. 10, 2025 ECF Min. Entry & Order; *see* Dec. 22, 2025 ECF Order; Jan. 14, 2026 ECF Order. In order to facilitate possible resolution of the matter via settlement, the Court granted the parties' request to adjourn the evidentiary hearing on the motion to compel arbitration set for January 9, 2026. Dec. 22, 2025 ECF Order.

On February 12, 2026, the parties filed a status report representing that a resolution could not be reached and requesting that the Court schedule a conference to discuss the scheduling and scope of a hearing on the pending motion to compel arbitration. Joint Status Report, ECF 35. The Court scheduled a status conference for March 2, 2026. Feb. 13, 2026 ECF Scheduling Order. At the March 2, 2026 conference, the Court rescheduled the evidentiary hearing for April 22, 2026. Mar. 2, 2026 ECF Min. Entry & Order. On April 22, 2026, the Court held an in-person evidentiary hearing on the motion to compel arbitration. Apr. 22, 2026 ECF Min. Entry & Order. At the hearing, two witnesses testified and the Court reserved decision on the motion. *Id.*

As discussed in the parties' briefing and at the evidentiary hearing, Defendant contends that Plaintiff's claims are subject to arbitration because the loan agreement between Plaintiff and Primis dated June 21, 2022 (the "Borrower Agreement") contains an arbitration provision that governs. Mem., ECF 25-1, at 1–2. Plaintiff, on the other hand, argues that (1) the Borrower Agreement was never formed, (2) Plaintiff's claims fall outside of the scope of the arbitration clause, (3) the arbitration provision is

5

unconscionable, and (4) Defendant has waived any right to arbitration based on its pre-litigation conduct. Opp'n, ECF 27, at 1–2.

## FINDINGS OF FACT[4]

As stated above, the Court held a hearing on the motion to compel arbitration on April 22, 2026. *See* Apr. 22, 2026 ECF Min. Entry & Order. Two witnesses testified at the hearing: Jonathan Watson, Vice President of Risk at Momnt Technologies, Inc., and Plaintiff Antonios Manalis. Evidentiary Hr'g Tr. ("Tr."), ECF 38, at 9:3–80:14 (Mr. Watson's testimony), 81:9–125:18 (Mr. Manalis's testimony). The evidence adduced at the hearing established the following facts.

## I. Hearing Testimony

### A. Jonathan Watson

Jonathan Watson is the Vice President of Risk at Momnt Technologies, Inc. *Id.* at 11:13. Momnt provides businesses with loan options to offer customers to be used to finance services offered by the business. *Id.* at 11:6–8. Momnt has arrangements with banks that provide the loaned funds, such as Primis Bank, as well as merchants, such as Wasatch Medical Clinic ("Wasatch"). *Id.* at 11:9–10, 15:5–7. Mr. Watson testified that in his role, he "oversee[s] the policies that were used to determine if merchants can use [Momnt's] platform based on financial and reputational risk." *Id.* at 13:19–21. Additionally, he oversees the policies regarding "identifying fraud and investigating customer disputes." *Id.* at 13:21–23. Mr. Watson is familiar with the "step by step loan application and approval process" that occurs "when a merchant's customers obtain a

---

[4] "When a court conducts an evidentiary hearing on a motion to compel arbitration, it may assess witness credibility and make factual findings based on the hearing testimony and documentary evidence." *WCW, Inc. v. Atlantis Indus., Inc.*, 698 F. Supp. 3d 708, 735 (D. Vt. 2023), *aff'd*, No. 23-7726-cv, 2024 WL 5038529 (2d Cir. Dec. 9, 2024).

loan through" Momnt's platform. *Id.* at 14:22–25. This is the loan application process at issue in the matter.

### B. Antonios Manalis

Plaintiff Antonios Manalis is a retired, 72-year-old resident of New York who visited Wasatch regarding blood clots in his legs. *Id.* at 88:17–22. He testified that he only went to the clinic once for an initial, free consultation and never went back. *Id.* at 89:12–13, 15–18. He asserts that while at the clinic, he did not apply for any loan. *Id.* at 94:10–95:18.

## II. The Borrower Agreement

### A. Mr. Watson's Testimony

#### 1. *Momnt's Connection to Wasatch and the Loan*

Mr. Watson's testimony largely concerned the operation of Momnt's loan application platform. Mr. Watson explained that, through Momnt's business arrangement with Wasatch Men's Clinic, patients visiting the clinic "would be given an option to finance rather than pay cash and would be presented with a[n] application for a loan that could be approved and funded to the business." *Id.* at 14:7–10. In other words, patients who visited Wasatch would "have an opportunity to apply for and obtain a loan through Primis Bank" via Momnt's loan application platform. *Id.* at 15:13–16. The "loan is in the name of the person applying for the loan and it is funded directly to the merchant the consumer wishes to pay." *Id.* at 68:25–69:2. As the Vice President of Risk at Momnt, Mr. Watson testified that he is familiar with the customer experience that a patient being presented with a loan option would encounter at the clinic. *Id.* at 14:18–15:4.

## 2. *The Operation of the Loan Agreement Platform*

Mr. Watson testified about the multi-step process that would occur for a patient at the clinic to apply for and accept a loan agreement. To start the process, an employee at the clinic "would have to log into their merchant portal" and use at least the patient's name, cell phone number, and email address to "submit a[n] invitation to the . . . customer's cell phone to allow them to apply." *Id.* at 15:20–16:2. The clinic obtains the patient's personal information from the patient. *Id.* at 16:7–10.

After the patient receives a text message from the platform to their cell phone, the patient would then need to click the link included in the text message to be directed to Momnt's web page to complete an online form. *Id.* at 16:16–17:1. Mr. Watson testified that there is no way for a patient to launch the website without clicking on the link contained in the text message to their cell phone, and that there is no way that the clinic could launch the website on behalf of the patient. *Id.* at 17:2–12.

Mr. Watson noted that Momnt's portal includes links in blue text that allow the patient to "click on the blue link and review" the underlying document containing various disclosures, terms, etc. *Id.* at 20:3–11. A sample of the webpage the patient would see was provided during the hearing:

*Id.* at 19:19–20:11; *see* McAndrew Decl., ECF 25-2, ¶ 16;[5] Watson Decl., ECF 37-1, ¶ 17. As a part of the loan process, the patient "would need to check the boxes agreeing that" the various links containing disclosures, consents, etc., were agreed upon. Tr., ECF 38, at 20:12–18. If the patient does not click on the check boxes to e-sign the various linked documents, the loan process cannot continue. *Id.* at 20:19–24. Mr. Watson confirmed that Momnt maintains records that indicate when the patient clicked on each check box indicating they consent to the various agreements. *Id.* at 20:25–21:2. Mr. Watson testified

---

[5] Lindsay McAndrew was the Chief Product Officer at Momnt and submitted the original declaration, and accompanying exhibits, attached to Defendant's motion to compel arbitration. *See generally* McAndrew Decl., ECF 25-2. However, Ms. McAndrew is no longer employed at Momnt and was therefore unavailable to serve as a witness at the evidentiary hearing. Def.'s Mot. for Leave to File, ECF 37, at 1. Accordingly, Defendant had Mr. Watson testify at the hearing and submitted Mr. Watson's declaration in lieu of Ms. McAndrew's "to be most efficient and to avoid any possible prejudice to Plaintiff from having a different witness (Mr. Watson) than the one who submitted the initial declaration (Ms. McAndrew) testify." *Id.* Mr. Watson's declaration is "substantially similar to Ms. McAndrew's declaration and attaches the exact same exhibits as well." *Id.* At the hearing, the Court granted, on consent, Defendant's request for leave to file Mr. Watson's declaration. Apr. 22, 2026 ECF Min. Entry & Order.

that after a patient checks the boxes and clicks next, the patient is then prompted to enter additional information as part of the application process, including their name, date of birth, address, and social security number, to the extent this information is not pre-populated based on the information provided to the clinic. *Id.* at 21:3–15. Mr. Watson also specified that the patient's social security number is not a pre-populated field and would require the patient to manually enter that information when prompted in order to continue through the loan application process. *Id.* at 21:16–23.

Once the patient enters the required information, the patient is then required to "choose a loan product." *Id.* at 21:24–22:2. Mr. Watson explained that "[t]he Momnt platform has multiple products that fit different scenarios for different customers."[6] *Id.* at 22:4–5. The loan "has to be selected before [the patient can] move to the next part of the process." *Id.* at 22:7–8. Once the patient chooses the particular loan product, the patient then is required to "agree to some additional consents." *Id.* at 22:9–15. Specifically, Mr. Watson testified that once the loan is approved, the patient is presented with a webpage prompting the patient to "finalize the loan by accepting the loan document, loan agreement and privacy notice from Primis Bank." *Id.* at 22:21–24. At the hearing, a sample of this webpage was also shown:

---

[6] Mr. Watson added that, in this case, the particular loan at issue "was a 24 month same as cash." Tr., ECF 38, at 22:5–7.

**To Finalize Your Loan, Complete Everything Below.**

☐ By checking this box, I have reviewed my Loan Documents

☐ The originating bank on your loan is Primis Bank. By checking this box, I accept my loan agreement with Primis Bank and their Privacy Notice

24 months of Principal-Only 0% APR. Up to 5 fixed principal payments of $550.00 followed by 19 amortizing payments of up to $2,753.57.

I Accept This Loan Agreement

*Id.* at 22:16–23:2; *see* McAndrew Decl., ECF 25-2, ¶ 18; Watson Decl., ECF 37-1, ¶ 19. The patient is able to click on the blue, hyperlinked text to be taken to the underlying document before checking the box indicating they agree to the terms contained in the documents. Tr., ECF 38, at 23:2–6. The patient must click both boxes, indicating that they have reviewed their loan documents, and that they accept the loan and Primis's privacy notice, in order for the loan process to continue. *Id.* at 23:7–12, 23:16–24:3. Once again, Mr. Watson confirmed that Momnt maintains "records that show when the consumer checked on the boxes" and "clicked [']I accept this agreement.[']" *Id.* at 24:4–7. Mr. Watson added that it is not possible for the patient to obtain the loan through Momnt's platform without checking the two boxes or clicking the final "I Accept This Loan Agreement" button. *Id.* at 24:8–11.

After the patient accepts the loan agreement, the patient is sent "[a] welcome email . . . with a copy of the loan agreement." *Id.* at 24:17–18. Mr. Watson testified that at this point, the patient and the bank have an active loan agreement. *Id.* at 25:8–10. However, the "actual amount of the loan" is not funded at this point. *Id.* at 25:11–13. Mr. Watson explained that "[t]he merchant would then need to log back into their merchant portal and send a request for the amount to be funded which would send an additional text message to the cell phone number on file." *Id.* at 25:16–19. The patient would "then

11

need to follow the process of clicking the link on that text message and will . . . have to enter the six[-]digit code provided in that text message[] to move forward to accept the funding." *Id.* at 25:19–23; *see id.* at 78:20–79:8. Once the patient "follows those instructions and approves the payment of the amount to the men's clinic" then the patient's balance on the loan is increased "by the amount approved by the funding." *Id.* at 26:13–16. Primis Bank provides the approved funding to the merchant's account. *Id.* at 26:17–23. At this point, the loan process is complete. *Id.* at 26:24–27:2.

### 3. The Loan Associated with Mr. Manalis[7]

Mr. Watson testified that, according to Momnt's records, "Mr. Manalis appl[ied] for and obtain[ed] a loan from Primis Bank using the process" described above. *Id.* at 28:22–25. Mr. Watson testified that Momnt's records show that Mr. Manalis "receive[d] a text message on his phone on June 21, 2022[,] with a link to the Momnt webpage platform" that prompted him to "apply for a loan with Wasatch." *Id.* at 29:1–7. Mr. Watson walked through Exhibit 1 ("Consumer Loan Consent Log"), which is "a copy of the consent log" for the loan for Mr. Manalis and details the timing of the consents received by Momnt via the loan platform. *Id.* at 29:11–30:6; *see* Consumer Loan Consent Log, Ex. 1. More specifically, the Consumer Loan Consent Log includes timestamps for when the text message links were clicked to activate the loan portal, when the consent check boxes on the portal were presented to the loan applicant, when the check boxes were clicked to indicate consent, and when the loan documents were sent to Primis and

---

[7] On cross examination, Mr. Watson specified that he did not personally create any of the loan documents associated with Mr. Manalis; rather, his testimony stems from his review of Momnt's records. Tr., ECF 38, at 53:16–54:4.

Momnt following those consents.[8] Tr., ECF 38, at 30:17–31:1, 33:24–34:16. Mr. Watson stated that this Consumer Loan Consent Log is for Mr. Manalis's loan because "Mr. Manalis's name is in the first and last name column along with the loan number associated with his loan agreement."[9] *Id.* at 30:2–6. Mr. Watson added that the email listed for Mr. Manalis in the Consumer Loan Consent Log is anthonygreek@hotmail.com and the phone number is (347) 552-3356. *Id.* at 30:10–16, 47:20–48:8.

According to Momnt's records, and Mr. Watson's testimony, various documents and consent forms, including Terms of Use, an Electronic Communication Consent, an E-Sign Disclosure and Consent, and a Telephone Consumer Protection Act ("TCPA") Consent were presented to Mr. Manalis on June 21, 2022 at 12:55 p.m. ET,[10] and Mr. Manalis consented to each of these forms on the same day at the same time. *Id.* at 34:17–35:5; *see* Consumer Loan Consent Log, Ex. 1. Mr. Watson went on to testify that according to the Consumer Consent Log, the Borrower Agreement and associated welcome email were sent to Mr. Manalis at 1:00 p.m. ET on the same day, June 21, 2022.

---

[8] Later in Mr. Watson's testimony, he confirmed that Exhibit 11, which detailed "the consumer transactions associated with Mr. Manalis" in connection with the loan, reflected a transaction on June 21, 2022, for $6,000 to Wasatch. Tr., ECF 38, at 47:1–14, 48:11–13; *see* Consumer Account Detail, Ex. 11. Mr. Watson confirmed that the mobile number that consented to the funding was (347) 552-3356, as reflected in the exhibit, which is "the same phone number for Mr. Manalis." Tr., ECF 38, at 47:20–48:8.

[9] As detailed in Exhibit 1, the name associated with the loan is "Anthony Manalis" and the loan number is "4623967427." Consumer Loan Consent Log, Ex. 1. On cross examination, Mr. Watson testified that "Anthony" was the name entered into the application and that the loan would only be approved if it matched the name of the applicant to the name associated with their provided social security number. Tr., ECF 38, at 56:12–15, 56:19–57:5.

[10] Mr. Watson clarified that the entries listed in Exhibit 1, the Consumer Loan Consent Log, reflect universal coordinated time (UTC) time, which is 4 hours ahead of eastern daylight time (*e.g.*, 4:55 PM UTC was 12:55 EDT). Tr., ECF 38, at 62:24–63:6; *see* Consumer Loan Consent Log, Ex. 1.

Tr., ECF 38, at 35:6–23; *see* June 21, 2022 Email, Ex. 3. Additionally, Mr. Watson testified that the Consumer Loan Consent Log indicates that the boxes confirming the loan terms for the Borrower Agreement were checked at 1:00 p.m. ET on the same day, June 21, 2022. *Id.* at 35:24–36:12. On cross examination, Mr. Watson confirmed that, according to Momnt's records, there were "about two minutes" between the "hard pull" credit check and the ultimate generation and execution of the Borrower Agreement. *Id.* at 67:6–13.[11]

Mr. Watson also testified that Exhibit 2 was a copy of Mr. Manalis's loan agreement with Wasatch Medical Group, established on June 21, 2022. *Id.* at 36:17–19, 37:2–8; *see* Borrower Agreement, Ex. 2. Mr. Watson added that he knows the loan agreement is associated with Mr. Manalis because his name, Anthony Manalis,[12] was at the top of the document, along with his phone number, (347) 552-3356, and his address. Tr., ECF 38, at 36:20–24; *see* Borrower Agreement, Ex. 2. Mr. Watson further confirmed that this Borrower Agreement, with loan number 4623967427, was attached to the welcome email sent to anthonygreek@hotmail.com and that this email matches the one provided in Momnt's Consumer Loan Consent Log. Tr., ECF 38, at 37:17–25; *see* Consumer Loan Consent Log, Ex. 1; Borrower Agreement, Ex. 2; June 21, 2022 Email, Ex. 3. Additionally, on cross examination, Mr. Watson clarified that while the loan agreement does not have a wet ink signature, the document explicitly states:

---

[11] Plaintiff's counsel established on cross examination of Mr. Watson that the Borrower Agreement is seven pages long, and that the arbitration agreement comprises two of those seven pages. Tr., ECF 38, at 68:2–10.

[12] On cross examination, when Mr. Watson was questioned about why the loan document reflected the name "Anthony" rather than "Antonios" for Mr. Manalis's first name, Mr. Watson testified that "[i]t is a name that's on [Mr. Manalis's] public records." Tr., ECF 38, at 55:16–18. Mr. Watson clarified that "[a]ny background check" would include "Anthony Manalis" as an alias for Mr. Manalis and that a background check is "part of the fraud review" conducted "[w]hen anybody files a dispute for a fraud claim." *Id.* at 55:20–56:2.

14

"Acceptance of this loan agreement by electronic signature." Tr., ECF 38, at 59:9–13; *see* Borrower Agreement, Ex. 2.

Mr. Watson went on to testify about the various other email exhibits that were sent to anthonygreek@hotmail.com. Tr., ECF 38, at 39:13–44:20, 46:3–21. These emails consisted of explanations of the loan's purchase window, closure of the purchase window, and monthly loan statements. *Id.*; *see* June 24, 2022 Email, Ex. 4; Sept. 12, 2022 Email, Ex. 5; Oct. 27, 2022 Email, Ex. 6; Nov. 27, 2022 Email, Ex. 7; Aug. 5, 2023 Email, Ex. 8; Combined Monthly Loan Statement Emails, Ex. 10. Mr. Watson confirmed that Momnt did not receive a bounce-back for any of these emails. Tr., ECF 38, at 40:4–8, 41:14–18, 41:22–42:1, 42:17–21, 43:5–12, 46:19–21. Each of these emails contained contact information for Momnt and Exhibit 8 further contained a phone number for Wasatch in the loan statement attached to the email. June 24, 2022 Email, Ex. 4; Sept. 12, 2022 Email, Ex. 5; Oct. 27, 2022 Email, Ex. 6; Nov. 27, 2022 Email, Ex. 7; Aug. 5, 2023 Email, Ex. 8; *see* Tr., ECF 38, at 39:13–44:20. Mr. Watson further testified that Exhibit 9, a July 12, 2024 email from Momnt to manalisanthony@gmail.com, stated that the "loan amortized with the principal and accrued interest." Tr., ECF 38, at 45:8–11; July 12, 2024 Email, Ex. 9. He added that this email notice was a part of Momnt's standard practice following the closure of the 24-month period wherein no interest was accruing on the loan. Tr., ECF 38, at 44:10–15, 45:12–14.[13] When asked about the change in Plaintiff's email address,

---

[13] Later in Mr. Watson's testimony, he confirmed that Exhibit 12, "a screenshot of the enterprise portal version of the consent log," further documents the various emails Momnt sent to Mr. Manalis. Tr., ECF 38, at 48:14–49:19; *see* Consumer Transaction Log, Ex. 12. Mr. Watson specified that the "User" column reflects the most recent email address for the consumer, which explains why manalisanthony@gmail.com is reflected in the column even for emails that predate Mr. Manalis's change in email address in 2024. Tr., ECF 38, at 49:1–17.

15

Mr. Watson testified that in "May of 2024," Mr. Manalis contacted Momnt and requested a change of his email address. *Id.* at 45:19–46:2.

On cross examination, Mr. Watson also discussed Momnt's investigation into Mr. Manalis's claim of fraud. Mr. Watson noted that Mr. Manalis contacted Momnt in November 2023. *Id.* at 75:8–11. He added that in this outreach, Mr. Manalis "said that he provided information but didn't have anything done" at the clinic. *Id.* at 75:23–24. Mr. Watson stated that because Mr. Manalis claimed that "he didn't apply for a loan," Momnt attempted to contact Wasatch, "the merchant," "to determine if they had any information on the applicant"; however, "[c]ommunication with the merchant stalled around that time because the clinics were going out of business." *Id.* at 69:16–24.

### B. Mr. Manalis's Testimony

#### 1. *The Clinic Visit*

Plaintiff testified that during his free consultation on June 21, 2022, at Wasatch Clinic, an individual at the clinic solicited his personal information. *Id.* at 89:5–6, 108:3–6. Plaintiff recounted that he gave "all the information," including his "social security number, [his] name, [his] driver license, [and] [his] passport card." *Id.* at 89:6–10. Plaintiff also supplied his email address, his telephone number, and his home address. *Id.* at 90:9–13. Plaintiff confirmed that his email address in June 2022 was anthonygreek@hotmail.com and that his telephone number was (347) 552-3356. *Id.* at 88:10–11, 108:10–15. Plaintiff added that this "type of information" was typical "for any doctor." *Id.* at 89:9–10. However, Plaintiff also added that "this doctor from the beginning . . . was unusual," which caused him to walk out and not return for any future visits. *Id.* at 89:11–14. Plaintiff asserted that he was at the clinic for "[n]ot even an hour" and that he left with no paperwork or prescriptions. *Id.* at 90:22–91:6.

Plaintiff testified that he did not pay Wasatch anything on the day of his visit because it was a free consultation. *Id.* at 89:15–18. Plaintiff added that during the consultation, the doctor advised that Plaintiff would need to return for "12 to 13 sessions in order to cure the blood clots"; Plaintiff noted that he was planning to pay for any additional visits with his own money rather than through insurance. *Id.* at 88:21–22, 89:19–90:5. When asked whether anyone at the clinic asked Plaintiff to apply for a loan or whether anyone at the clinic mentioned Primis Bank or Momnt, Plaintiff responded "[n]o." *Id.* at 90:14–21.

Plaintiff further testified that on June 21, 2022, he never: (1) visited a website called PayMomnt.com or Momnt.com; (2) clicked on any links sent to him by the clinic; (3) clicked on any links provided by Momnt or Primis; (4) opened an account on Momnt's platform; (5) filled out a loan application on any online platform; (6) created a username or password for any loan platforms; (7) checked a box agreeing to any terms of use or privacy policies; (8) clicked on a button indicating his acceptance of a loan agreement; or (9) electronically signed a borrower agreement. *Id.* at 94:10–95:18. He went on to assert that he did not authorize Primis Bank to open a loan account in the name of Anthony Manalis. *Id.* at 98:1–3. When presented with the Borrower Agreement, Plaintiff asserted that he had never seen the document before and confirmed that it did not have his signature on it. *Id.* at 96:6–21. Plaintiff also asserted that he never: (1) authorized purchases from Wasatch Medical Group; (2) received money from Wasatch; (3) received any goods from Wasatch; or (4) received any services from Wasatch. *Id.* at 98:4–13.

On cross examination, Plaintiff testified that during his clinic visit, he did not give his cell phone to anyone. *Id.* at 109:17–23. He added that no one at the clinic asked

17

to see his cell phone, and that his phone was in his jacket pocket during the consultation. *Id.* at 109:19–23.

### 2. *Awareness of the Loan Agreement*

Plaintiff asserts that he first learned of the pending loan when he checked his credit report and "saw Primis had a lien, unpaid loan for three months." *Id.* at 104:16–17.[14] Plaintiff testified that upon learning of the loan, he called Defendant Primis and "argue[d] with them," claiming that the loan was not his. *Id.* at 104:24–25. Additionally, Plaintiff testified that he returned to the clinic "three times" to ask for the records in connection with his consultation. *Id.* at 91:10–16.

Plaintiff added that learning of the loan made his blood pressure higher and that he "developed a sickness . . . to get up in the morning to go check [his] credit report." *Id.* at 105:8–10. He added that the situation also impacted his sleep. *Id.* at 105:12–13.

### 3. *Email Usage and the Loan-Related Emails*

As noted above, Plaintiff testified that his email address was anthonygreek@hotmail.com. *Id.* at 88:10–11, 98:18–20. Plaintiff stated that he does not generally receive emails, but that when he receives emails from accounts he does not recognize, he does not respond. *Id.* at 98:25–99:5. Plaintiff later added that he does not "know how to work the account" and generally does not check his email. *Id.* at 111:24–112:1.

Plaintiff was shown Defendant's Exhibit 3, an email with the subject "Hello and congratulations on your loan approval!," dated June 21, 2022, sent to

---

[14] When asked for the timeframe of this discovery, Plaintiff could not recall exactly. Tr., ECF 38, at 104:18–21. Plaintiff first noted he made the discovery in 2025 but then changed his answer to 2024 or "[s]omewhere around there." *Id.*

anthonygreek@hotmail.com from support@momnt.com regarding loan number 462-396-7427. June 21, 2022 Email, Ex. 3. Plaintiff asserted that he never received this email. Tr., ECF 38, at 99:22–23. When shown Defendant's Exhibits 4 through 10, which were all emails sent from support@momnt.com to anthonygreek@hotmail.com (aside from Exhibit 9, which was sent to manalisanthony@gmail.com) regarding loan number 462-396-7427, from June 24, 2022, through July 12, 2024, Plaintiff denied receiving any of these email communications. *Id.* at 99:24–102:15; Emails, Exs. 4–10. In fact, Plaintiff asserted that he "never receive[d] anything" from Defendant Primis, "[n]o mail, no email." Tr., ECF 38, at 104:5.

Plaintiff also testified that in addition to his anthonygreek@hotmail.com email address, he created a second email address, manalisanthony@gmail.com, in the last two years. *Id.* at 108:22–109:5. He also contended that he does not go by the name "Anthony." *Id.* at 109:12–13.

### III. Discussion

For the reasons discussed below, the Court largely credits Mr. Watson's testimony describing the loan application process generally and, more specifically, Momnt's records regarding the Borrower Agreement. At the same time, Mr. Manalis's testimony, including the assertion that he did not consent to the Borrower Agreement, is entitled to less weight. As discussed herein, Plaintiff's testimony largely consisted of conclusory statements and denials, and was undermined by other evidence, including at times his own self-contradictory assertions.

First, based on the undisputed testimony, Mr. Manalis's phone number is (347) 552-3356 and his two email addresses are anthonygreek@hotmail.com and manalisanthony@gmail.com. Tr., ECF 38, at 88:10–11, 108:10–109:5. While Mr. Manalis contended that he does not go by "Anthony," this assertion is contradicted by his own

19

testimony that both of his email addresses contain the name "Anthony" in them rather than "Antonios." *Compare id.* at 109:12–13 (asserting he does not go by "Anthony") *with id.* at 108:13–109:8 (confirming his email addresses, both of which contain the name "Anthony"). Accordingly, the Court concludes that "Anthony Manalis" is a name used by Plaintiff.

Second, the Court credits Mr. Watson's testimony regarding how the loan application platform operates. Namely, the Court finds that the loan application process is initiated by a link sent to a cell phone number for the applicant, inviting them to apply for a loan; when the link is clicked, boxes must be checked at every step of the process to indicate consent to the terms contained in hyperlinked loan documents, and the loan documents are then sent to Primis and Momnt following those consents.[15] *Id.* at 15:20–24:11. Additionally, the Court credits that in order to fund the loan, an additional link and a six-digit code is sent via text message to the applicant's phone, and the platform requires the holder of the phone to accept or reject the funding to the merchant by clicking the new link and entering the code. *Id.* at 25:16–26:9. Moreover, the Court credits Mr. Watson's testimony that, for this type of loan, the patient's social security number is not a pre-populated field in the loan process and requires the patient to manually enter that information when prompted in order to continue through the loan application process. *Id.* at 21:16–23.

Third, in light of the operation of the loan approval process, which requires access to the patient's cell phone, Plaintiff's claim that he did not agree to the loan

---

[15] The Court notes that, based on the evidence presented, four check boxes would need to be clicked prior to the loan applicant clicking "I Accept This Loan Agreement." Watson Decl., ECF 37-1, ¶¶ 17, 19.

agreement himself is contradicted by his own testimony. As established above, Plaintiff confirmed that his cell phone number matches the cell phone number where all the links related to the loan application process were sent. *Id.* at 108:10–12. Plaintiff testified that during his clinic visit, he did not give his cell phone to anyone while he was at the clinic. *Id.* at 109:17–23. He added that no one at the clinic asked to see his cell phone, and that his phone was in his jacket pocket during the consultation. *Id.* at 109:19–23. As discussed *supra*, Plaintiff further testified that on June 21, 2022, he never took any steps to initiate or approve the loan. *Id.* at 94:10–95:18 (denying taking any of the nine actions discussed above). He went on to assert that he did not authorize Primis Bank to open a loan account in the name of Anthony Manalis. *Id.* at 98:1–3. However, considering that Plaintiff claimed that during his clinic visit, he did not give his cell phone to anyone, and in light of the Consumer Loan Consent Log, which documents when each link was sent to Mr. Manalis's phone, the Court finds that Plaintiff is the only person who could have completed the loan application process based on the facts presented. *Id.* at 109:17–23.[16] Plaintiff's conclusory allegations to the contrary do not provide any genuine dispute as to any material fact regarding (1) the operation of Momnt's loan application platform or (2) Plaintiff's involvement in the loan application process. More specifically, Plaintiff made no credible claim as to fraud during his testimony, much less *who* may have fraudulently consented to the various loan documents or *how* any alleged

---

[16] This conclusion is further supported by the fact that Plaintiff's testimony was largely self-serving and conclusory. In addition, although a relatively minor contradiction, as noted above, Plaintiff asserted that he did not use the name "Anthony" but then confirmed that he had two email addresses with the name "Anthony" in them. Tr., ECF 38, at 108:22–109:5, 109:12–13. Additionally, Plaintiff provided many conclusory answers and denials, at times even before his attorney finished positing the question, and demonstrated a lack of clarity as to the timeline of events when asked. *Id.* at 94:19–24, 104:18–21.

fraudster could have gained access to his cell phone to click the link texted to him to initiate and complete the multi-step loan process. Rather, Plaintiff testified that he had possession of his cell phone throughout the clinic visit and that he was the owner of the email accounts to which various loan documents and subsequent notices regarding the loan were sent. Plaintiff claimed that he did not receive any of the numerous emails sent by Momnt regarding the Borrower Agreement; however, Plaintiff did not contest that the email address the loan-related emails were sent to was his, nor did he contend that these emails were sent to a spam or other folder. *Id.* at 99:22–23.

Additionally, to the extent Plaintiff may assert that he was misled into agreeing to the arbitration agreement, there is also a notable absence of evidence as to *how* anyone at the clinic allegedly misled Plaintiff regarding the nature of the agreement. *See generally id.* Notably, when asked whether anyone at the clinic asked Plaintiff to apply for a loan or whether anyone at the clinic mentioned Primis Bank or Momnt, Plaintiff simply responded "[n]o." *Id.* at 90:14–21.

For all these reasons, and as discussed further below, the Court concludes that Plaintiff did not offer credible evidence to establish that (1) he did not complete the loan application process and agree to the Borrower Agreement or (2) that he was coerced or misled into signing the Borrower Agreement.

## CONCLUSIONS OF LAW

### I.  Legal Standards

#### A.  The Federal Arbitration Act

Pursuant to the Federal Arbitration Act (the "FAA"):

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of

22

one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. Moreover, under the FAA, an agreement to arbitrate "shall be valid, irrevocable, and enforceable." *Id.* § 2; *see Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 235 (2d Cir. 2006). The FAA reflects "a liberal federal policy favoring arbitration agreements." *AT & T Mobility LLC v. Concepcion* ("*Concepcion*"), 563 U.S. 333, 346 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *see CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (collecting cases); *New Prime Inc. v. Oliveira*, 586 U.S. 105, 120 (2019).

Despite the strong federal policy in favor of arbitration, the FAA places arbitration agreements on "'the same footing as other contracts.'" *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974)); *see Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019). Notably, the FAA does not require parties to arbitrate unless they have agreed to do so. *Schnabel*, 697 F.3d at 118; *see Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 395 (2d Cir. 2015) (observing that the "liberal policy in favor of arbitration is limited by the principle that 'arbitration is a matter of consent, not coercion'" and that, as a matter of contract, "'a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit.'" (quoting *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 171 (2d Cir. 2004) (alteration in original)).

When confronted with a motion to compel arbitration, "[c]ourts consider two factors when deciding if a dispute is arbitrable: '(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue.'" *Cooper v. Ruane Cunniff & Goldfarb, Inc.*, 990 F.3d 173, 179 (2d Cir. 2021) (quoting *Holick*, 802 F.3d at 394). Additionally, if federal statutory claims are asserted, courts

23

must determine "whether Congress intended . . . [those] claims to be non-arbitrable." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022); *see Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019). The Second Circuit has further "emphasized that there is a strong presumption in favor of arbitration and that waiver of the right to arbitration 'is not to be lightly inferred.'" *Coca-Cola Bottling Co. of N.Y. v. Soft Drink & Brewery Workers Union Loc. 812 Int'l Bhd. of Teamsters*, 242 F.3d 52, 57 (2d Cir. 2001) (quoting *Cotton v. Slone*, 4 F.3d 176, 179 (2d Cir. 1993) (internal quotation marks omitted)). "The party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Zachman*, 49 F.4th at 101–02. Importantly, this initial burden "does not require the moving party to show that the agreement would be enforceable — only that an agreement to arbitrate existed." *Id.* at 102 (citing *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019)).

In deciding a motion to compel arbitration, courts apply a "'standard similar to that applicable for a motion for summary judgment.'" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)). Courts must "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits," and must "draw all reasonable inferences in favor of the non-moving party." *Id.* (quotation marks omitted). Additionally, "[o]n a motion to compel arbitration, the Court accepts as true the allegations in the complaint that relate to the underlying dispute between the parties." *In re Document Techs. Litig.*, Nos. 17-CV-2405, 17-CV-3422, 17-CV-3917 (JSR), 2017 WL 2840280, at *1 (S.D.N.Y. Apr. 27, 2017) (citing *Schnabel*, 697 F.3d at 113).

24

### B.  New York Contract Law

The threshold question of whether the parties have agreed to arbitrate is determined by state contract law. *Schnabel*, 697 F.3d at 119 (collecting cases); *Nicosia*, 834 F.3d at 229. Here, the parties have agreed that New York contract law applies. *See* Apr. 22, 2026 ECF Min. Entry & Order.

It is axiomatic that for a contract to be binding, there must be a "meeting of the minds and a manifestation of mutual assent." *Starke*, 913 F.3d at 288 (quotation marks omitted); *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 703 (2d Cir. 2023). "The manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Starke*, 913 F.3d at 289; *see Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004).

Oftentimes, whether the offeree was on notice depends on "whether the contract terms were presented to the offeree in a clear and conspicuous way." *Starke*, 913 F.3d at 289. If the offeree does not have actual notice of a contract term, the offeree is still bound by the term if they are on inquiry notice and assents to the term "through conduct that a reasonable person would understand to constitute assent." *Id.* (citing *Schnabel*, 697 F.3d at 120). More specifically, in determining whether an offeree is on inquiry notice, "New York courts look to whether the term was obvious and whether it was called to the offeree's attention." *Id.* These foundational contract law principles apply in equal force to contracts stemming from online transactions. *Id.*; *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017).

### C.  Clickwrap Agreements

As the Second Circuit has observed, "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Register.com*, 356 F.3d at 403; *see Starke*, 913 F.3d at 289 (collecting cases).

25

The foundational principle of a manifestation of mutual assent between parties as a prerequisite to contract formation "appl[ies] with equal force to contracts formed online." *Edmundson*, 85 F.4th at 703. In this digital age, "[c]ourts around the country have recognized that an electronic 'click' can suffice to signify the acceptance of a contract, and that there is nothing automatically offensive about such agreements, as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement." *Meyer*, 868 F.3d at 75 (quotation marks and alterations omitted). Nonetheless, the Second Circuit has acknowledged that "an offeree's manifestation of assent to an offeror's terms looks different for consumer contracts formed online, in which terms are usually unnegotiated and consumers often proceed without reading the fine print." *Edmundson*, 85 F.4th at 703 (collecting cases).

As relevant here, "clickwrap" (or a "click-through") agreements "require users to click an 'I agree' box after being presented with a list of terms and conditions of use." *Meyer*, 868 F.3d at 75 (citing *Nicosia*, 834 F.3d at 233); *see also Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014).[17] Because a clickwrap agreement requires that the user affirmatively assent to the terms of the agreement by clicking "I agree," courts regularly uphold clickwrap agreements. *Meyer*, 868 F.3d at 75 (citing *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012) (collecting cases)). More specifically, "[i]n the context of agreements made over the internet, such 'click-wrap' contracts are enforced under New York law as long as the consumer is given a sufficient opportunity to read the end-user license agreement, and assents thereto after being

---

[17] The contract here is described by Defendant as a "hybrid clickwrap" and seems to incorporate some aspects of a "browsewrap" agreement, "which generally post terms and conditions on a website via a hyperlink." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017).

26

provided with an unambiguous method of accepting or declining the offer." *Serrano v. Cablevision Sys. Corp.*, 863 F. Supp. 2d 157, 164 (E.D.N.Y. 2012); *S.G. v. Synchrony Bank*, No. 24-CV-5788 (GRB) (SIL), 2026 WL 205939, at *4 (E.D.N.Y. Jan. 27, 2026), *report and recommendation adopted*, Mar. 25, 2026 ECF Order Adopting R. & R.

Courts in this Circuit have found that in situations "where there is no evidence that an internet or app user had actual knowledge of the contractual terms, the user will still be bound if (1) a reasonably prudent person would be on inquiry notice of the terms, and (2) the user unambiguously manifests assent through conduct that a reasonable person would understand to constitute assent." *Edmundson*, 85 F.4th at 703 (quotation marks, citations, and alterations omitted); *see id.* at 703–04 (describing a reasonably prudent internet or smartphone user as one who "is not a complete stranger to computers or smartphones, having some familiarity with how to navigate to a website or download an app" (internal quotation marks omitted)). Importantly, both of these inquiries "are generally measured by an objective standard and are clearly fact-intensive." *Id.* at 703 (quotation marks, citations, and alterations omitted).

As discussed above, "[w]hether a reasonably prudent user would be on inquiry notice turns on the '[c]larity and conspicuousness of arbitration terms.'" *Meyer*, 868 F.3d at 75 (quoting *Specht v. Netscape Commc'n Corp.*, 306 F.3d 17, 30 (2d Cir. 2002)). Notably, "in the context of web-based contracts . . . clarity and conspicuousness are a function of the design and content of the relevant interface." *Id.* (citing *Nicosia*, 834 F.3d at 233). Accordingly, "only if the undisputed facts establish that there is '[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms' will" a court "find that a contract has been formed." *Id.* (quoting *Specht*, 306 F.3d at 35). To the extent that the reasonableness of notice is a primary question underpinning the enforceability of a web-based contract, courts must engage

27

in a fact-intensive inquiry. *Id.* at 76 (citing *Schnabel*, 697 F.3d at 124). In general, in determining whether an interface provides reasonable notice of contract terms contained in a hyperlink, the Second Circuit has considered whether the screen is uncluttered, whether the text including the hyperlink is spatially coupled with the check box button, whether the screen requires the user to scroll, and whether there is clear language directing the user to read the terms contained in a hyperlink. *See Starke*, 913 F.3d at 292; *Meyer*, 868 F.3d at 77–80; *Nicosia*, 834 F.3d at 233–38; *Edmundson*, 85 F.4th at 704.

## II. Analysis

### A. Validity of the Borrower Agreement

#### 1. *The Agreement to Arbitrate*

As discussed above, Plaintiff's testimony established that he had control of his cell phone throughout the entirety of his visit to Wasatch, and therefore he was the only person who could have applied for a loan with Defendant using Momnt's platform. Through Momnt's loan application process, Plaintiff was presented with a link that led him to the loan application platform. Watson Decl., ECF 37-1, ¶ 7. The loan application platform includes hyperlinks for the loan documents, which included the arbitration agreement, in bolded, blue text. *Id.* ¶ 9. By inputting his personal information and checking the multiple boxes confirming that he had read and consented to the various terms and conditions contained in the loan documents, Plaintiff affirmatively consented to the arbitration agreement. *See Nicosia*, 834 F.3d at 232 ("As with paper contracts or shrinkwrap agreements, to be bound, an internet user need not actually read the terms and conditions or click on a hyperlink that makes them available as long as she has notice of their existence."); *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 831 (S.D.N.Y. 2020) ("Whether [the plaintiff] actually clicked on the hyperlinked terms to read the

28

[Terms of Service] or the Privacy Policy is immaterial; what matters is that notice of these terms was reasonably conspicuous."); *Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 724–25 (E.D.N.Y. 2017) (noting the "clearly established law holding that failure to read a contract is not a defense to contract formation") (collecting cases); *Lewis v. Samsung Elecs. Am., Inc.*, No. 22-CV-10882 (JLR), 2023 WL 7623670, at *9 (S.D.N.Y. Nov. 14, 2023) ("While it may be the case that many users will not bother reading the additional terms, that is the choice the user makes; the user is still on inquiry notice." (citing *Meyer*, 868 F.3d at 79)).

Plaintiff has not established any plausible dispute as to the conspicuousness of the arbitration agreement contained in the loan documents and, because Momnt's platform provided a conspicuous hyperlink (in bolded, blue text) that took Plaintiff directly to the Borrower Agreement containing the arbitration provision at issue, Plaintiff was put on inquiry notice. *Synchrony Bank*, 2026 WL 205939, at *5 (collecting cases). Courts in this Circuit have consistently found that an arbitration agreement was sufficiently conspicuous and put a plaintiff on inquiry notice where the hyperlink containing the specific terms of the agreement appears next to a "consent" or "sign up" button. *See id.* (collecting cases); *see also Ibrahim v. Nassau County*, No. 24-CV-4888 (EK) (SIL), 2025 WL 2605527, at *6 (E.D.N.Y. Sept. 9, 2025); *Borukh v. Experian Info. Sols., Inc.*, No. 24-CV-6022 (NRM) (JRC), 2025 WL 1220042, at *10 (E.D.N.Y. Apr. 28, 2025). Moreover, the webpage where Plaintiff was presented with the hyperlinks was "uncluttered," and "[t]he entire screen is visible at once." *Meyer*, 868 F.3d at 78. Additionally, Plaintiff does not assert that he was not afforded adequate time to review the contents of the various loan documents, including the Borrower Agreement; rather, he denies that any of this happened. *See generally* Tr., ECF 38.

29

Overall, the conspicuousness and placement of the hyperlink containing the loan documents, along with the general design of the webpage, would put a reasonably prudent internet user on inquiry notice. Accordingly, when Plaintiff clicked the boxes to indicate he had "reviewed [his] Loan Documents" and that he "accept[s] [his] loan agreement with Primis Bank," he unambiguously manifested his assent to the arbitration agreement. Watson Decl., ECF 37-1, ¶ 19; *see Meyer*, 868 F.3d at 79–80; *Flores v. Chime Fin., Inc.*, No. 21-CV-4735 (RA), 2022 WL 873252, at *5 (S.D.N.Y. Mar. 23, 2022) (plaintiff could not have enrolled "without affirmatively agreeing to the terms and conditions on the page with the clickwrap agreement, and accordingly, no reasonable trier of fact could find that she did not assent to the arbitration"). Plaintiff's manifestation was further confirmed when he subsequently clicked "I Accept this Loan Agreement." Watson Decl., ECF 37-1, ¶ 19.

In opposition, Plaintiff asserts that he is the victim of fraud and that he did not agree to the Borrower Agreement. Opp'n, ECF 27, at 5–10. However, as set forth above and as discussed further below, Plaintiff has provided no credible evidence to establish a valid claim of fraud concerning the formation of the agreement. The Court notes that "'it is not sufficient for the party opposing arbitration to utter general denials of the facts on which the right to arbitration depends.'" *Greenberg v. Ameriprise Fin. Servs., Inc.*, No. 15-CV-3589 (ADS) (AYS), 2016 WL 3526025, at *5 (E.D.N.Y. Mar. 31, 2016) (quoting *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995)). "Rather, where, as here, 'the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried.'" *Id.* (quoting *Oppenheimer & Co.*, 56 F.3d at 358). Plaintiff has not submitted any credible evidence to establish a genuine dispute of fact as to Defendant's showing, supported by Mr.

30

Watson's declaration and testimony, that the Borrower Agreement could only have been accepted by clicking a link and multiple consents via Plaintiff's cell phone and, further, could only have been funded through an additional link and additional consents also sent to Plaintiff's phone.

Accordingly, the Court finds that Defendant has met its burden to demonstrate that Plaintiff consented to the arbitration agreement via a valid contract.

### 2. *Enforceability of the Arbitration Agreement*

As stated above, "[n]otwithstanding the liberal policy favoring arbitration, the FAA still permits the invalidation of an otherwise valid arbitration clause when certain 'generally applicable contract defenses, such as fraud, duress, or unconscionability' apply." *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 554–55 (S.D.N.Y. 2018) (quoting *Concepcion*, 563 U.S. at 339). "Once the existence of an agreement to arbitrate is established, the burden shifts to the party seeking to avoid arbitration to 'show[] the agreement to be inapplicable or invalid.'" *Zachman*, 49 F.4th at 102 (quoting *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010)). Here, Plaintiff raises two such claims that purportedly undermine the enforceability of the arbitration agreement: fraud and unconscionability. The Court takes each argument in turn.

### a. Fraud

Plaintiff asserts the defense of fraud in the factum. Opp'n, ECF 27, at 8–9. When a plaintiff alleges fraud in the factum, he is asserting that the contract is "'[v]oid'" and "'produce[s] no legal obligation.'" *Adams v. Suozzi*, 433 F.3d 220, 227 (2d Cir. 2005) (quoting *Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26, 31 (2d Cir. 2001)). "'Fraud in the factum occurs when the maker of the note is tricked into believing that which he is signing is something other than a promissory or obligatory note,' and where 'the misrepresentation is regarded as going to the very character of the proposed

contract itself.'" *Nowak v. JPMorgan Chase & Co.*, 847 F. App'x 31, 35 (2d Cir. 2021) (quoting *Revak v. SEC Realty Corp.*, 18 F.3d 81, 91 (2d Cir. 1994) (internal quotation marks and alteration omitted)); *see Revak*, 18 F.3d at 91 (observing that fraud in the factum arises "when one party induces the other to sign a document by falsely stating that it has no legal effect"); *see also Langley v. Fed. Deposit. Ins. Corp.*, 484 U.S. 86, 94 (1987) (describing fraud in the factum as "the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents"). "As the Second Circuit has noted, '[s]uch contracts are rare.'" *McCaddin v. Southeastern Marine Inc.*, 567 F. Supp. 2d 373, 379 (E.D.N.Y. 2008) (quoting *Sphere Drake Ins. Ltd.*, 263 F.3d at 31).

　　To prevail on a defense of fraud in the factum, "a party must show excusable ignorance of the contents of the writing signed." *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 32 (2d Cir. 1997) (quotation marks omitted). "Proving excusable ignorance requires a showing that the party satisfied its basic responsibility of reading what it signed." *McCaddin*, 567 F. Supp. 2d at 380 (quotation marks omitted). "When a plaintiff alleges facts supporting a claim for fraud-in-the-factum, the Court must address those claims rather than sending them to arbitration." *Fayez-Olabi v. Credit Acceptance Corp.*, No. 21-CV-5443 (AMD) (LGD), 2022 WL 2918119, at *5 (E.D.N.Y. July 25, 2022) (citing

32

*McCaddin*, 567 F. Supp. 2d at 378 (observing that "any triable issues of fact regarding fraud in the execution must be addressed by the court and not the arbitrator")).[18]

Moreover, "[f]raud claims are subject to a 'heightened pleading standard' under Federal Rule of Civil Procedure 9(b)." *Nowak*, 847 F. App'x at 35 (quoting *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)). Specifically, Rule 9(b) "'requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent.'" *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402–03 (2d Cir. 2015) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (internal quotation marks omitted)); *see United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016) ("Rule 9(b) requires that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" (quoting Fed. R. Civ. P. 9(b)). "In other words, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *United States ex rel. Polansky v. Pfizer, Inc.* ("*Polansky*"), No. 04-CV-0704 (ERK), 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009) (quotation marks omitted).

Here, Plaintiff does not allege any facts to satisfy the heightened pleading requirement of Rule 9(b). Rather, the complaint simply posits conclusory allegations

---

[18] The Court notes that Plaintiff's counsel affirmatively asserts that "this is not a case of fraudulent inducement." Opp'n, ECF 27, at 8. Accordingly, the Court declines to consider whether there was fraudulent inducement in the creation of the contract, and further notes that "'[i]t is well settled that a claim or defense of fraudulent inducement, when it challenges generally the enforceability of a contract containing an arbitration clause rather than specifically the arbitration clause itself, may be subject to arbitration.'" *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 170 (2d Cir. 2004) (quoting *ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 29 (2d Cir. 2002)).

that he was a victim of identity theft and that the loan was the product of fraud. *See generally* Compl. While Plaintiff attempts to assert that the fraud occurred during or shortly following his visit to Wasatch, he provides no detailed allegations as to the "who, what, when, where and how of the alleged fraud." *Polansky*, 2009 WL 1456582, at *4 (quotation marks omitted). Plaintiff does not claim that anyone misled him into signing the contract, or allege facts and circumstances underpinning his claim of a fraudulent loan agreement.[19] *See, e.g.*, *Fayez-Olabi*, 2022 WL 2918119, at *6 (finding that the "plaintiff's fraud allegation is insufficient to create a genuine issue of material fact as to the existence of the contract" because "[h]e claims only that the defendant misled him into signing the contract, but includes no specific factual allegations"); *Schatzmann v. Harris Partners Ltd.*, No. 21-CV-7301 (KPF), 2024 WL 1255296, at *8 (S.D.N.Y. Mar. 22, 2024) (finding that the plaintiffs did not establish fraud in the factum because they did not show that the defendant misrepresented the nature of the contract or that they had excusable ignorance); *Ipcon Collections LLC v. Costco Wholesale Corp.* ("*Ipcon*"), 698 F.3d 58, 62 n.5 (2d Cir. 2012) (observing that the plaintiff, who alleged neither that the defendant had forged a contract nor that the defendant had mispresented the contract's enforceability, could not support a claim of fraud in the factum).

---

[19] Plaintiff counsel's opposition to the motion to compel arbitration contends that Plaintiff "has provided a detailed and plausible account of identity theft, substantiated by his sworn complaint and his filing of the FTC Report." Opp'n, ECF 27, at 10 (citing Compl., ECF 1, ¶¶ 11–19). In response, Defendant argues that "the Complaint is not verified and Plaintiff has not submitted any sworn testimony." Reply, ECF 28, at 9. Although Plaintiff has since testified at the evidentiary hearing, as explained above, even taking the allegations in the complaint as true and taking into consideration Plaintiff's hearing testimony, Plaintiff has not plausibly alleged a claim of fraud and, more specifically, has still not detailed any specifics as to the *who* and the *how* of the alleged fraud.

Here, Plaintiff's allegations "are not of the type that could support a claim for fraud in the factum." *Ipcon*, 698 F.3d at 62 n.5. Nowhere in the complaint does Plaintiff allege that Defendant: (1) "changed the documents after they were signed," (2) "claimed it had authority to enter into the agreements when it in fact did not," or (3) "misrepresented the enforceability of the contract." *Id.* (citing *Hetchkop*, 116 F.3d at 32; *Buckeye Check Cashing v. Cardegna*, 546 U.S. 440, 444 n.1 (2006); *Revak*, 18 F.3d at 91). Moreover, Plaintiff's hearing testimony provided no additional facts to establish any plausible claim of fraud. Rather, as set forth above, Plaintiff made no claim that anyone at the clinic obtained possession of his phone during his visit, nor did he make any assertion that he was pressured or misled by anyone at the clinic into signing the Borrower Agreement. Additionally, Plaintiff's hearing testimony forecloses the possibility of establishing excusable ignorance because Plaintiff simply stated that he had never seen or reviewed the loan documents, including the Borrower Agreement. *See McCaddin*, 567 F. Supp. 2d at 380 ("Proving excusable ignorance requires a showing that the party satisfied its basic responsibility of reading what it signed." (quotation marks omitted)).

Accordingly, as Plaintiff's claim of fraud in the factum is "insufficient to create a genuine issue of material fact as to the existence of the contract," the Court finds that it does not render the Borrower Agreement void. *Fayez-Olabi*, 2022 WL 2918119, at *6 (collecting cases).

b. Unconscionability[20]

Under New York law, a contract is unconscionable when it is "'so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable [] according to its literal terms.'" *Ragone v. Atl. Video at Manhattan Center*, 595 F.3d 115, 121 (2d Cir. 2010) (quoting *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009) (internal quotation marks omitted)). "Generally, there must be a showing that such a contract is both procedurally and substantially unconscionable." *Id.* (quoting *Nayal*, 620 F. Supp. 2d at 571). Courts consider procedural and substantive unconscionability on a "sliding scale," meaning that "the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa." *Simar Holding Corp. v. GSC*, 928 N.Y.S.2d 592, 595 (App. Div. 2d Dep't 2011) (quoting *State of New York v. Wolowitz*, 468 N.Y.S.2d 131, 145 (App. Div. 2d Dep't 1983)); *see also Hojnowski v. Buffalo Bills, Inc.*, 995 F. Supp. 2d 232, 238 (W.D.N.Y. 2014).

i. *Procedural Unconscionability*

"'The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice . . . .'" *Ragone*, 595 F.3d at 121–22 (quoting *Nayal*, 620 F. Supp. 2d at 571 (internal quotation marks omitted)); *see also David L. Threlkeld & Co., Inc. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 249 (2d Cir. 1991) (noting that the "purpose of the unconscionability doctrine is to prevent unfair surprise

---

[20] The Court notes that Plaintiff's opposition argues that "the Virginia choice-of-law clause is unenforceable as it violates New York's fundamental public policy." Opp'n, ECF 27, at 13 (capitalization altered). As the parties agreed that the Court may apply New York law for the purposes of the motion to compel arbitration, the Court need not engage with this aspect of Plaintiff's argument.

and oppression" (quoting *Pierson v. Dean, Witter, Reynolds, Inc.*, 742 F.2d 334, 339 (7th Cir. 1984))); *Clinton v. Oppenheimer & Co. Inc.*, 824 F. Supp. 2d 476, 483 (S.D.N.Y. 2011) ("For a contract to be held unconscionable, the party alleging the defect must generally show both substantive and procedural unconscionability. . . . That is, the contract must unreasonably favor one party over the other and the process of contract formation must have deprived the disadvantaged party of meaningful choice.") (collecting cases); *Nayal*, 620 F. Supp. 2d at 571. Relevant factors for the Court to consider "include the commercial setting of the transaction, the experience and education of the parties, disparity in bargaining power, as well as whether 'deception, high-pressured tactics, and the use of fine print' were used to deprive the disadvantaged party of a 'meaningful choice.'" *Victorio v. Sammy's Fishbox Realty Co., LLC*, No. 14-CV-8678 (CM), 2015 WL 2152703, at *12 (S.D.N.Y. May 6, 2015) (quoting *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 787 (2d Cir. 2003)).

It is well settled, however, that mere inequality in bargaining power alone is not a sufficient reason to hold that an arbitration agreement is not enforceable. *Nayal*, 620 F. Supp. 2d at 572 (collecting cases). However, unequal bargaining power "when coupled with high pressure tactics that coerce [a signatory's] acceptance of onerous terms, may be sufficient to show that [the signatory] lacked a meaningful choice." *Brennan v. Bally Total Fitness*, 198 F. Supp. 2d 377, 382 (S.D.N.Y. 2002) (citations omitted). However, "even if the Agreement was a form contract offered on a 'take-it-or-leave-it' basis and [the party] refused to negotiate the Arbitration Provision, this is not sufficient under New York law to render the provision procedurally unconscionable." *Nayal,* 620 F. Supp. 2d at 571 (collecting cases).

Here, Plaintiff did not face a "'lack of meaningful choice.'" *Ragone*, 595 F.3d at 121–22 (quoting *Nayal*, 620 F. Supp. 2d at 571 (internal quotation marks omitted)).

37

"Procedurally, the [arbitration] provision is not unconscionable as [P]laintiff[] had 45 days to opt out" of it. *Valle v. ATM Nat., LLC*, No. 14-CV-7993 (KBF), 2015 WL 413449, at *6 (S.D.N.Y. Jan. 30, 2015); *see Pabon v. HRB Digital LLC*, No. 23-CV-5363 (EK) (ARL), 2025 WL 2254008, at *4 (E.D.N.Y. Aug. 7, 2025) ("An agreement is not procedurally unconscionable if there is a meaningful opportunity to opt out." (quotation marks omitted)); *id.* (finding arbitration agreement with 30-day opt out period not procedurally unconscionable) (collecting cases); *see also* Borrower Agreement, Ex. 2, ¶ 22 ("Opt-Out Process: You may choose to opt out of and not be subject to this Arbitration Provision . . . [by] notify[ing] us in writing within forty-five (45) calendar days of the date of the Agreement"); Tr., ECF 38, at 73:10–17. Accordingly, the 45-day "opt-out provision . . . substantially negates any challenge of procedural unconscionability." *Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 55 (E.D.N.Y. 2017) ("Courts applying New York law have considered an opt-out provision as an important, if not dispositive, factor in rejecting challenges of procedural unconscionability.") (collecting cases).

Although Plaintiff contends that the arbitration clause contained within the Borrower Agreement is a contract of adhesion that was presented to Plaintiff on a "take-it-or-leave-it basis," Opp'n, ECF 27, at 14 (quotation marks omitted), as established above, that is not the case — Plaintiff had the opportunity to opt out. Even assuming, *arguendo*, that the Borrower Agreement was presented on a "take-it-or-leave-it basis," *id.*, that is not a sufficient basis "under New York law to render the [arbitration]

38

provision procedurally unconscionable." *Nayal*, 620 F. Supp. 2d at 571 (collecting cases).[21]

Additionally, Plaintiff did not assert that he was pressured to accept the terms of the Borrower Agreement, including the arbitration provision, by anyone at the clinic. Nor did Plaintiff contend that anyone at the clinic took his phone from him or took control of his phone. Moreover, Plaintiff did not contend that he does not understand English, and in fact he testified in English. *See generally* Tr., ECF 38. Accordingly, there is no evidence that high-pressure tactics were used to cause Plaintiff to feel that he had no choice but to sign on the spot without reviewing the terms he was agreeing to. While this Court does recognize that, as a practical matter, Plaintiff may have felt pressure to complete the loan agreement process in order to continue to his free consultation, and that he may genuinely not remember clicking on his phone as part of his check-in for his appointment, there was no evidence provided in the complaint, Plaintiff's papers, or at the evidentiary hearing that anyone exerted any pressure such that the agreement would be rendered procedurally unconscionable. *See generally* Compl., ECF 1; Opp'n, ECF 27; Tr., ECF 38. Rather, by Plaintiff's account, the formation of the contract never happened. But the testimony at the hearing and documentary evidence show that is not true.

---

[21] Notably, "'[f]or an arbitration provision to be stricken as a contract of adhesion there must be a showing of unfairness, undue oppression, or unconscionability.'" *JLM Indus., Inc.*, 387 F.3d at 170 n.5 (quoting *David L. Threlkeld & Co., Inc. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 249 (2d Cir. 1991) (internal quotation marks omitted)) (citing *Klos v. Lotnicze*, 133 F.3d 164, 168–69 (2d Cir. 1997) ("The concept of adhesion . . . may not be invoked to trump the clear language of the agreement unless there is a disturbing showing of unfairness, undue oppression, or unconscionability.")). As discussed, the arbitration provision here is not unconscionable, nor has there been a showing of oppression or unfairness, and therefore it will not be stricken as a contract of adhesion.

The evidence presented by Defendant shows that Plaintiff had the opportunity to click each link to read the terms at each step of the loan agreement process. Moreover, as established above, the hyperlink to the Borrower Agreement, which included the arbitration provision, was conspicuous — presented on an uncluttered interface — such that a reasonable internet user would know to click the link to read the agreement. Plaintiff's failure to read the loan documents does not render the Borrower Agreement procedurally unconscionable. *See Red Fort Cap., Inc. v. Guardhouse Prods. LLC*, No. 19-CV-0686 (PKC) (RWL), 2020 WL 5819549, at *9 (S.D.N.Y. Sept. 30, 2020) (finding that counterclaimant's "failure to read or review the [contract] does not make it a procedurally unconscionable contract"); *De Jesus v. Gregorys Coffee Mgmt., LLC*, No. 20-CV-6305 (MKB) (TAM), 2022 WL 4229331, at *8 (E.D.N.Y. June 9, 2022) ("A misunderstanding, or lack of inquiry, regarding the nature of a contract is not enough to prove procedural unconscionability."), *report and recommendation adopted*, 2022 WL 3097883 (E.D.N.Y. Aug. 4, 2022). "Indeed, courts often decline to find procedural unconscionability in situations where the form contract has a clear statement of the arbitration agreement and its scope." *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 249 (S.D.N.Y. 2020) (collecting cases), *objections overruled*, No. 10-CV-6950 (AT) (RWL), 2021 WL 4199912 (S.D.N.Y. Sept. 15, 2021).

Therefore, the Court finds that the formation of the agreement to arbitrate was not procedurally unconscionable.

### ii. Substantive Unconscionability

"'[T]he substantive element [of unconscionability] looks to the content of the contract.'" *Ragone*, 595 F.3d at 122 (quoting *Nayal,* 620 F. Supp. 2d at 571 (internal quotation marks omitted)). A substantively unconscionable contract is one that is "'so grossly unreasonable or unconscionable in light of the mores and business practices of

40

the time and place as to be unenforceable according to its literal terms.'" *Chen-Oster*, 449 F. Supp. 3d at 250 (quoting *Ragone*, 595 F.3d at 121 (internal quotation marks omitted)). "'While determinations of unconscionability are ordinarily based on [a] conclusion that both the procedural and substantive components are present, there have been exceptional cases where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone.'" *Ragone*, 595 F.3d at 122 (alteration in original) (quoting *Gillman v. Chase Manhattan Bank N.A.*, 73 N.Y.2d 1, 12 (1988)).

That is clearly not the case here. It is well settled that "there is no inherent unfairness or unconscionability in an arbitration clause if both parties are bound by it and know of its existence." *JLM Indus., Inc.*, 387 F.3d at 170 n.5 (citing *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 207 (2d Cir. 1999); *Doctor's Assocs., Inc. v. Jabush*, 89 F.3d 109, 113 (2d Cir. 1996)). Here, the arbitration clause clearly binds both parties and is not inherently unconscionable. The arbitration provision in the Borrower Agreement states: "NEITHER YOU [Plaintiff] NOR WE [Primis] WILL HAVE THE RIGHT TO LITIGATE A CLAIM IN COURT OR HAVE A JURY TRIAL ON A CLAIM." Borrower Agreement, Ex. 2, ¶ 22. As discussed above, Plaintiff indicated his assent to the Borrower Agreement containing the arbitration provision when he checked the consent box and the agreement was sent to his email address. Once again, "failure to read or review" a contract does not render the contract unconscionable, and both Plaintiff and Defendant are bound by its terms. *See Red Fort Cap., Inc.*, 2020 WL 5819549, at *9.

Plaintiff argues, however, that the arbitration provision contained in the Borrower Agreement is substantively unconscionable because it "strip[s] a consumer of his ability to effectively vindicate his rights under federal law, a result that is both one-

41

sided and contrary to public policy." Opp'n, ECF 27, at 15. Plaintiff goes on to cite cases regarding "effective vindication" and an instance where an arbitration clause was unenforceable because it foreclosed a category of statutory relief. *Id.* (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985); *Cedeno v. Sasson*, 100 F.4th 386 (2d Cir. 2024), *cert. denied sub nom. Argent Tr. Co. v. Cedeno*, 145 S. Ct. 447 (2024)). These cases are inapposite — here, Plaintiff's claims are not foreclosed by the arbitration provision. Plaintiff simply is required to raise his claims in the context of arbitration, and courts regularly find that FCRA and FCBA claims are subject to arbitration. *See, e.g., Fayez-Olabi*, 2022 WL 2918119, at *4 (granting motion to compel arbitration of the plaintiff's FCRA and Fair Debt Collection Practices Act claims); *Ostreicher v. TransUnion, LLC*, No. 19-CV-8174 (KMK), 2020 WL 3414633, at *9–10 (S.D.N.Y. June 22, 2020) (granting motion to compel arbitration for the plaintiff's FCRA claims) (collecting cases); *Zandman v. Citibank, N.A.*, No. 18-CV-0791 (NSR) (PED), 2020 WL 354787, at *1 (S.D.N.Y. Jan. 21, 2020) (discussing results of the arbitration of the plaintiff's FCBA claims); *Kurz v. Chase Manhattan Bank USA, N.A.*, 319 F. Supp. 2d 457, 459–60 (S.D.N.Y. 2004) (granting motion to compel arbitration of the plaintiff's claims, including FCBA claim); *Baird v. Comenity Bank (Victoria's Secret)*, No. 26-CV-0891 (VSB) (KHP), 2026 WL 1133996, at *1 (S.D.N.Y. Apr. 27, 2026) (same). "In the context of arbitration, terms are not substantively unconscionable unless they preclude parties from pursuing their rights in the arbitral forum." *Rolle v. VisionPro Connections Inc.*, No. 23-CV-9025 (LDH) (CLP), 2025 WL 1309418, at *10 (E.D.N.Y. Jan. 31, 2025) (quotation marks and alterations omitted), *report and recommendation adopted*, Mar. 31, 2025 ECF Order Adopting R. & R. Here, "there is actually nothing in the [arbitration provision] on its face that prevents a plaintiff from pursuing his claims in the arbitral forum." *Id.* Rather, Plaintiff had the ability to opt out of the arbitration agreement and, because he

42

did not do so, must now bring his claims in the arbitral forum. Plaintiff's mere preference for federal court over arbitration does not render the agreement unconscionable.

Accordingly, the Court finds that the Borrower Agreement is likewise not substantively unconscionable.

## B. Applicability of the Arbitration Provision to Plaintiff's Claims

Due to the "'strong federal policy favoring arbitration as an alternative means of dispute resolution,'" a court must "resolve any doubts concerning the scope of arbitrable issues 'in favor of arbitrability.'" *Daly*, 939 F.3d at 421 (quoting *State of N.Y. v. Oneida Indian Nation of N.Y.*, 90 F.3d 58, 61 (2d Cir. 1996)). The Second Circuit has noted that the scope of the FAA is limited to "'agreements to arbitrate controversies that arise out of the parties' contractual relationship' — that is, controversies that were 'cause[d]' by the relationship." *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 119 (2d Cir. 2025) (alteration in original) (quoting *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 652 n.4 (2022) (internal quotation marks omitted)). Courts "'will compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Daly*, 939 F.3d at 421 (quoting *Oneida Indian Nation of N.Y.*, 90 F.3d at 61). Framed another way, "[a]court may only compel arbitration where it is 'satisfied that neither the formation of the parties' arbitration agreement *nor* . . . its enforceability or applicability to the dispute is in issue.'" *Loc. Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*, 67 F.4th 107, 113 (2d Cir. 2023) (alteration in original) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010)).

Here, the arbitration provision contained in the borrower agreement encompasses:

43

> any claim, dispute or controversy of every kind and nature, whether based in law or equity, between you [Plaintiff] and us [Primis] arising from or relating to your Loan Agreement as well as the relationship resulting from such Agreement . . . including the validity, enforceability or scope of this Arbitration Provision or the Agreement . . . [and] claims by or against any third party providing any product, service or benefit in connection with the Agreement.

Borrower Agreement, Ex. 2, ¶ 22. As courts in this circuit have repeatedly found, "[a]n arbitration clause that contains the phrase 'any claim or controversy arising out of or relating to the agreement' is considered 'the paradigm of a broad clause.'" *ADR/JB, Corp. v. MCY III, Inc.*, 299 F. Supp. 2d 110, 114 (E.D.N.Y. 2004) (quoting *Collins & Aikman Prods. Co. v. Bldg. Sys. Inc.*, 58 F.3d 16, 20 (2d Cir. 1995)); *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 100 (S.D.N.Y. 2015); *Cullum v. Wyndham Hotels & Resorts Corp.*, No. 22-CV-9700 (LTS) (SN), 2024 WL 552494, at *5 (S.D.N.Y. Feb. 12, 2024), *reconsideration denied*, 2024 WL 3104517 (S.D.N.Y. June 24, 2024), *aff'd*, No. 24-1949-cv, 2025 WL 2020942 (2d Cir. Apr. 10, 2025). Moreover, the arbitration provision contains a delegation clause, leaving to the arbitrator the question of what claims are related to the "scope of this Arbitration Provision." Borrower Agreement, Ex. 2, ¶ 22. The arbitration agreement's "broad delegation clause . . . evidence[s] a clear and unmistakable intent to delegate the issue of arbitrability to the arbitrator." *Taylor v. Verizon Commc'ns Inc.*, No. 25-CV-1081 (CM), 2025 WL 1938778, at *3 (S.D.N.Y. July 15, 2025). In instances where a plaintiff challenges an agreement as a whole, rather than "the delegation clause of the arbitration provision alone," courts "must enforce the arbitration agreement under 9 U.S.C. §§ 3 and 4." *Faith v. Khosrowshahi*, No. 21-CV-6913 (JMA) (JMW), 2023 WL 5278126, at *7 (E.D.N.Y. Aug. 16, 2023) (collecting cases); *see Chaloh v. Chrysler Cap. LLC*, No. 25-CV-1675 (EK) (LKE), 2026 WL 764624, at *6 (E.D.N.Y. Mar. 18, 2026) (collecting cases regarding whether "the arbitration clause applies to Plaintiff's FCRA claims"). Therefore, "[c]onsistent with this broad language, issues of arbitrability, including the

44

scope of the agreement, must be decided by the arbitrator if the parties have expressly agreed to delegate those issues to the arbitrator." *Roitman v. T-Mobile USA Inc.*, No. 23-CV-6159 (ENV) (LKE), 2025 WL 3156503, at *10 (E.D.N.Y. July 28, 2025).

Even if the Court could decide the issue as to the scope of the arbitration provision, the Court disagrees with Plaintiff's contention that his claims fall outside of the scope of the agreement. The plain, broad terms of the arbitration provision establish that the parties agreed to arbitrate claims "resulting from" the Borrower Agreement, including Plaintiff's FCRA and FCBA claims. As established above, courts regularly find that FCRA and FCBA claims are subject to arbitration.

Plaintiff attempts to argue that his claims fall outside of the scope of the arbitration provision because the claims stem from alleged statutory duties imposed on Primis by the FCRA and the FCBA rather than from the Borrower Agreement. Opp'n, ECF 27, at 10–11. However, Plaintiff's narrow approach is contradictory to the weight of the case law finding similar claims subject to arbitration in similar contexts. Notably, the Borrower Agreement advised Plaintiff that Primis "may report information about [his] Loan to credit bureaus." Borrower Agreement, Ex. 2, ¶ 11. Plaintiff's claims as stated in the complaint allege, *inter alia*, that Primis (1) "furnished information relating to Plaintiff to one or more [credit reporting agencies] . . . that it knew or had reasonable cause to believe was inaccurate," even after Plaintiff filed a formal dispute, and (2) failed to adequately respond to Plaintiff's billing error notifying Primis that "Plaintiff did not authorize, apply for, or receive the proceeds of this loan." Compl., ECF 1, ¶¶ 47–48, 94–97. As Defendant argues, "[w]ithout the Loan from Primis Bank and the Borrower Agreement, Primis Bank would have no credit information for Plaintiff and would not have reported such credit information regarding Plaintiff and his Loan to the credit bureaus." Reply, ECF 28, at 4–5. Plaintiff's claim that there is no

nexus between the Borrower Agreement and his FCRA and FCBA claims fails because Primis "could not have engaged in the conduct that led to" Plaintiff's alleged harms "in the absence of a contractual relationship." *Roitman*, 2025 WL 3156503, at *10; *cf. Chaloh*, 2026 WL 764624, at *5 ("All of Plaintiff's claims arise from the allegation that Chrysler failed to properly report the termination of the Lease Agreement, resulting in negligence, defamation, libel, and a violation of the FCRA."). Therefore, "Plaintiff's arguments that these claims arise out of statutory and not contractual disputes do not help h[im], because statutory claims relating to" the Borrower Agreement "are unambiguously subject to arbitration." *Biller v. Am. Express Co.*, No. 19-CV-7173 (DLI) (PK), 2021 WL 7208647, at *6 (E.D.N.Y. Feb. 23, 2021) (finding that the plaintiff's FCRA claim fell within the broad language of the arbitration agreement); *see Kurz*, 319 F. Supp. 2d at 460 ("[E]ven where an arbitration agreement requires the arbitration of disputes involving a federal statute, the parties to a valid arbitration agreement are compelled to arbitrate 'so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum.'" (second alteration in original) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991) (internal quotation marks omitted)); *cf. Taylor*, 2025 WL 1938778, at *4 ("It simply does not violate public policy for courts to enforce private agreements to arbitrate — even agreements between behemoth corporations and individuals, and even agreements that cover disputes over violations of federal laws[.]").

Accordingly, the Court finds that the arbitration provision applies to Plaintiff's FCRA and FCBA claims.

### C. Waiver

Finally, Plaintiff contends that, "[e]ven if a valid agreement to arbitrate existed," Defendant "has waived any right to enforce it" through its pre-litigation conduct.

46

Opp'n, ECF 27, at 17. More specifically, Plaintiff asserts that "Primis acted inconsistently with any purported right to arbitrate" because in response to Plaintiff's calls to "dispute the fraudulent account," Primis "did nothing." *Id.* Plaintiff contends that, despite being on "unequivocal notice" of Plaintiff's dispute, Primis "did not respond to [Plaintiff's] disputes with an offer to arbitrate or a demand to do so" and "wait[ed] to see if Mr. Manalis would file a lawsuit." *Id.* Defendant asserts that it "never waived its right to arbitration" and "has actively pursued arbitration since Plaintiff filed this case." Reply, ECF 28, at 8.

"Waiver of the right to arbitrate is not to be lightly inferred, and any doubts must be resolved in favor of arbitration." *State Farm Mut. Auto. Ins. Co. v. Emuna Inc.* ("*Emuna*"), 823 F. Supp. 3d 242, 247 (E.D.N.Y. 2026) (citing *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 25 (2d Cir. 1995)). A party waives arbitration, however, when it acts inconsistently with its right to arbitrate. *See, e.g., Doyle v. UBS Fin. Servs., Inc.*, 144 F.4th 122, 130 (2d Cir. 2025); *Emuna*, 823 F. Supp. 3d at 247 (citing *Morgan v. Sundance, Inc.*, 596 U.S. 411, 415 (2022)). To determine whether a party has waived its right to arbitrate, a court must consider: "(1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery." *La. Stadium & Expo. Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d Cir. 2010); *see LifeTree Trading Pte. Ltd. v. Washakie Renewable Energy, LLC*, 764 F. App'x 105, 107 (2d Cir. 2019) (stating same); *see also Doyle*, 144 F.4th at 129–30 (stating same but specifying that prejudice is no longer a factor to be considered in the analysis). In considering the issue of waiver, a court "may consider all aspects of the moving party's conduct" in the specific context of the particular case. *Doyle*, 114 F.4th at 130; *see La. Stadium & Expo. Dist.*, 626 F.3d at 159 ("There is no rigid formula or bright-line rule for identifying when a party has waived

47

its right to arbitration; rather, the above factors must be applied to the specific context of each particular case.").

As to the first factor, "delays of a year or greater can evince a desire to litigate rather than arbitrate." *Emuna*, 823 F. Supp. 3d at 248 (collecting cases). As to the second factor, "courts consider pursuing merits litigation as constituting a significant amount of litigation," including "moving to dismiss on the merits, seeking dispositive relief, or pursuing resolution of arbitrable issues in federal court, before invoking arbitration." *Id.* (citing *Doyle*, 144 F.4th at 131–32) (collecting cases).

"Ordinarily a defense of waiver brought in opposition to a motion to compel arbitration is a matter to be decided by the arbitrator." *Meyer*, 868 F.3d at 80 (alterations omitted). Nevertheless, "[w]hen the party seeking arbitration has participated in litigation regarding the dispute, the district court can properly decide the question of waiver." *Id.* at 80–81. For example, when the "waiver argument is based on defendants' defense of [the] litigation in the district court," it is "a question for the district court rather than an arbitrator." *Id.* at 81.

Here, the basis of Plaintiff's argument rests solely on Defendant's actions *prior* to the commencement of litigation. Therefore, Plaintiff's waiver argument is not based on Defendant's "defense of [the] litigation in the district court" *per se*, and the Court questions whether the defense of waiver is an issue properly before this Court. *Id.*; *Schreiber v. Friedman*, No. 15-CV-6861 (CBA) (JO), 2017 WL 5564114, at *8–9 (E.D.N.Y. Mar. 31, 2017) (noting conflicting approaches by courts in the Second Circuit regarding whether the issue of waiver should be determined by the court or an arbitrator and observing that "[i]n circumstances where the defense of waiver is based on pre-litigation conduct inconsistent with the right to arbitrate, courts in the Second Circuit have continued to" consider the issue). As Defendant has "participated in litigation

48

regarding the dispute," *Meyer*, 868 F.3d at 80–81, and does not dispute whether the issue is properly before this Court, the Court considers whether Defendant's "pre-litigation and litigation conduct waived [its] right to arbitrate," *Schreiber*, 2017 WL 5564114, at *9. *See* Reply, ECF 28, at 8–9; Opp'n, ECF 27, at 17. Ultimately, the Court finds Plaintiff's argument unavailing.

At the outset, the Court notes that Plaintiff "has not cited any case where a party's right to insist on arbitration was waived based on *pre-litigation* conduct" and the Court likewise has found none. *Snyder v. Wells Fargo Bank, N.A.*, No. 11-CV-4496 (SAS), 2011 WL 6382707, at *5 (S.D.N.Y. Dec. 19, 2011). Additionally, this is not a situation where Defendant "raise[d] unjustifiable objections to a valid demand for arbitration, all the while protesting its willingness in principle to arbitrate and then, when the other side has been forced to abandon its demand, seek to defeat a judicial determination by asking for arbitration after suit has been commenced." *Lane, Ltd. v. Larus & Brother Co.*, 243 F.2d 364 (2d Cir. 1957); *see Farr Whitlock Dixon & Co. v. S. S. Gen. Tsakalotos*, 244 F. Supp. 544, 546 (S.D.N.Y. 1965) (noting that where a defendant has previously refused to submit to arbitration when the plaintiff was "ready, able and willing to arbitrate its claim and arbitrators were standing by to hear it," the defendant "ought not in fairness be able to shift its position and force arbitration on" the plaintiff). Based on these observations alone, the Court concludes that Plaintiff has not established that Defendant has waived its right to arbitrate.

Nevertheless, turning to the waiver factors, the Court first considers "the time elapsed from when litigation was commenced until the request for arbitration." *La. Stadium & Expo. Dist.*, 626 F.3d at 159. Here, the timing of Defendant's initiation of the motion to compel arbitration supports a desire to arbitrate. Plaintiff initiated this action on June 2, 2025. *See generally* Compl., ECF 1. Primis was served on June 3, 2025, and

49

counsel appeared in the case on behalf of Primis on June 16, 2025. Aff. of Service, ECF 6; Notice of Appearance, ECF 8. Primis then filed its letter motion for a pre-motion conference requesting leave to file a motion to compel arbitration on July 31, 2025, less than two months later. *See generally* Pre-Mot. Conference Letter, ECF 16. Following leave of Court, the fully briefed motion to compel arbitration was filed on September 19, 2025. *See* Mot., ECF 25; Opp'n, ECF 27; Reply, ECF 28. While there is no hard and fast rule "regarding when delay supports waiver, '[c]ourts have found delays longer than a year . . . not to constitute waiver.'" *Cimillo v. Experian Info. Sols., Inc.*, No. 21-CV-9132 (VB), 2023 WL 2473403, at *9 (S.D.N.Y. Mar. 13, 2023) (alteration in original) (quoting *In re Generali COVID-19 Travel Ins. Litig.*, 577 F. Supp. 3d 284, 294 (S.D.N.Y. 2021)) (collecting cases). Accordingly, the Court finds that a period of approximately two months between the initiation of the lawsuit and Defendant's request to compel arbitration to not constitute waiver.

As for the second prong, regarding the amount of litigation to date, the Court notes that at the Initial Conference on September 10, 2025, the Court directed the parties to engage in limited discovery, "including but not limited to meeting and conferring, and exchanging all underlying documents and evidence, such as correspondence, the bank's file, and the file of the loan servicer." Sept. 10, 2025 ECF Min. Entry & Order. Shortly thereafter, Defendant's fully briefed motion to compel arbitration was filed on September 19, 2025. While that motion was pending, in November 2025, the parties indicated their willingness to engage in settlement discussions, and a settlement conference was held before the Court on December 10, 2025. *See* Nov. 7, 2025 ECF Min. Entry & Order; Dec. 10, 2025 ECF Min. Entry & Order. While Plaintiff's argument regarding waiver rests on Defendant's pre-litigation conduct, the Court nevertheless notes that engaging in the "minimal exchange of documents," at the direction of the

50

Court; appearing at mandatory court conferences; and engaging in mediation and settlement do not establish waiver. *Pierre v. Rochdale Vill. Inc.*, No. 18-CV-6383 (MKB) (ST), 2020 WL 6799635, at *7 (E.D.N.Y. Nov. 19, 2020); *see Cimillo*, 2023 WL 2473403, at *10.

Here, Defendant's motion to compel arbitration clearly "is not a fallback position" or "a second bite at the apple." *Doyle*, 144 F.4th at 131. Accordingly, the Court concludes that Defendant's actions do not constitute a waiver of its right to arbitrate.

## CONCLUSION

For the foregoing reasons, the Court grants Defendant's motion to compel arbitration and, pursuant to Section 3 of the FAA, imposes a stay in this proceeding while the parties pursue arbitration. 9 U.S.C. § 3; *see also Katz v. Cellco P'ship*, 794 F.3d 341, 343 (2d Cir. 2015) (The FAA "requires a stay of proceedings when all claims are referred to arbitration and a stay [is] requested.").

**SO ORDERED.**

Dated: Brooklyn, New York
July 24, 2026

*Taryn A. Merkl*
TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE